UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00159-TBR

STEPHANIE GALE HARMAN                                                                          Plaintiff

v.

WESTERN BAPTIST HOSPITAL and BAPTIST                                                     Defendants
HEALTHCARE SYSTEM, INC.

**MEMORANDUM OPINION**

This matter is before the Court upon Defendants Western Baptist Hospital and Baptist Healthcare System, Inc.'s (collectively "Defendants") Motion for Summary Judgment. (Docket No. 22.) Plaintiff Stephanie Gale Harman has responded. (Docket No. 33.) Defendants have replied. (Docket No. 37.) This matter is now fully briefed and ripe for adjudication. For the following reasons, the Court will **GRANT** Defendants' Motion for Summary Judgment. (Docket No. 22.)

Plaintiff has filed a Motion to File a Second Amended Complaint. (Docket No. 21.) Defendants have responded in opposition. (Docket No. 29.) This matter is now ripe for adjudication. Because the Court grants the Defendants summary judgment on the ADEA claim and the claim the Second Amended Complaint seeks to add has the same elements as an ADEA claim, the Court will **DENY** Plaintiff's Motion to File a Second Amended Complaint. (Docket No. 21.)

Plaintiff Stephanie Gale Harman has also made a Motion for Summary Judgment. (Docket No. 24.) Defendants have responded. (Docket No. 30.) This matter is now ripe for

adjudication. For the following reasons, the Court will **DENY** Plaintiff's Motion for Summary Judgment. (Docket No. 24.)

BACKGROUND

Plaintiff Stephanie Gale Harman was employed by the Defendants from June 1993 until January 29, 2012. (Docket No. 17, at 3 ¶ 11.) In 2006, Harman was assigned the position of Emergency Room Department (ED) Charge Analyst, a promotion from her previous position of Health Unit Coordinator. (*Id*. at ¶ 14.) The job duties of the Charge Analyst position included "the review of charges for various medical services in the ED to attempt to capture revenues from charges in the ED." (*Id*. at ¶14.) In essence, a Charge Analyst reviews the documentation from services rendered in the ED to ensure charges are correct and justified. (Docket No. 25-2, at 16.) After this review, a Charge Analyst provides the prepared information to employees with coding responsibilities to facilitate billing for the services and supplies identified as chargeable. (*Id*. at 18-19.)

The Defendants have produced documents, dated June 16, 2009, discussing a "best practices" or restructuring plan, which essentially recommends changing some of the duties of the ED Charge Analyst and requiring that they have a clinical background. (Docket No. 23, at 8-13.) These documents state, in relevant part:

> **Western Baptist Hospital**
> **ED Charge Capture/Charge Entry Business Case**
> **6/16/09**
>
> There have been challenges related to the charge capture processes in the Emergency department over the last 2 years.
> . . . .
> The current charge capture process relies on the nursing staff to accurately document clinical procedures and infusion start/stop times. The nursing

staff also completes the visit level assignment tool and the charge ticket (to indicate procedures performed).

. . . .

After data analysis and interviews with the ED leadership team it has been determined that the current charge capture process can be improved both from an accuracy and timeliness perspective by enhancing the charge entry staff role (both personnel skill set and responsibilities).

. . . .

At BHE and CHB, which have similar ED volumes and acuity to WBH, the Emergency department employs 2.0 full time staff members for charge entry. These individuals review the nursing documentation and subsequently complete the visit level assignment tool and charge ticket. They are responsible for determining the infusion and injection charges in a manner, which is consistent with CMS's complex infusion hierarchy rules. The charge entry staff members are also responsible for entering all ED charges and performing charge reconciliation. This model is consistent with industry best practice for accurate and thorough ED charge capture.

WBH would benefit from a similar ED charge capture model. *The ideal staff for these positions would have a strong clinical background in Emergency Medicine (i.e. ED RN experience).*

(Docket No. 23, at 8) (emphasis added).

A "Western Baptist Hospital Action Plan" and accompanying chart, dated December 7, 2009, states "[a] new charge process was approved in the fall of 2009" and designates January 2010[1] as the time period which "licensed" staff would be identified for the new positions and trained. (Docket No. 23, at 10-11.) Regarding new staff identification, it states one was "identified already."[2] (*Id*. at 11.) While not entirely clear, every indication from the Action Plan and the corresponding chart was that the "plan" would be fully implemented in January or February 2010. (*See* Docket No. 23, at 10-13.)

---

[1] The Court assumes that the transcription of January 2009, rather than 2010, was a typographical error. (*See* Docket No. 23, at 11.)

[2] It appears that this was in reference to Gwyn Parsons because the Defendants contend she was "transferred" into the ED Charge Analysis position on a part-time basis on December 6, 2009.

The Defendants have also produced two Job Opening listings, apparently posted on June 16, 2009, for ED Charge Analyst positions. (Docket No. 23, at 2-6.) The qualifications section of these job postings state:

> Current licensure by the Kentucky Board of Nursing as an LPN or by the Kentucky Board of Emergency Medical Services as a paramedic is required. Emergency Department experience is preferred.

(Docket No. 23, at 3, 6.)

In January 2010, Harman notified Defendant Baptist Hospital that she needed to take a medical leave of absence in order to seek treatment for breast cancer. (Docket No. 17, at 3-4 ¶ 17.) After Harman's return to work in April 2010, she was notified that she was to "no longer review patient charges but only to input coding information, effectively removing 90% of [her] job duties as Charge Analyst."[3] (Docket No. 17, at 4 ¶ 21.)

Prior to taking FMLA leave, Harman taught another employee, Julie Daunis, the "basics" of the position and Daunis would assume some of the job duties while Harman was out on vacation. (Docket No. 25-2, at 5-6.) When Harman took FMLA leave, Daunis "temporarily" performed the Charge Analysis duties. (Docket No. 17, at 3-4.) After Harman's return from FMLA leave, Daunis continued to work as a Charge Analyst and Harman would sometimes answer questions she had regarding the position. (Docket No. 17, at 3-4.) Subsequently, Daunis assumed the Charge Analyst position on a permanent basis, although she cannot recall exactly when she became permanent. (Docket No. 25-2, at 9-10.) Daunis did not apply for the Charge Analyst position when it was advertised, but was instead recruited by the Defendants to

---

[3] At that point, upon her return from FMLA leave, Harman states that charge entry consumed only approximately one hour for each day of ED services to patients. Her other duties included assisting with the scheduling of personnel to work in the ED, as well as ordering and stocking supplies needed for patient care in the ED.

permanently assume it. (Docket No. 25-2, at 5.) Daunis continued in the position after Harman's eventual termination. (Docket No. 17, at 3-4.)

In December of 2011, Harman was notified by Beth Winters, who had just been made the ER Director in June of 2011, that "her position was being 'phased out' and was given 60 days notice to apply for another position at the hospital with no assurance she would be hired." (*Id*. at ¶ 23.) Harman's job duties were formally transferred to the Finance Department and assumed by Julie Daunis and Gwyn Parsons—both of whom had already been performing these job duties for several months.[4] (Docket No. 25-1, at 57-59.) At no point prior to the notice of discharge in December 2011 or the filing of this lawsuit was Harman informed that her job would be terminated, eliminated, or transferred to another department. Harman alleges that her termination, effective February 2012, was a violation of the FMLA and ADEA.[5]

Harman was born on March 4, 1959, and was 52 years old in December 2011, at the time she received notice of her discharge. (Docket No. 1, at 3 ¶ 10.) Daunis was born on November 13, 1967, and was 44 years of age in December 2011. (Docket No. 25-8, at 3.) Daunis had prior experience as an Emergency Room Technician. (Docket No. 25-2, at 14-15.) Gwyn Parsons was born in April 1974, (Docket No. 40-1, at 8), and 37 years of age in December 2011, (Docket No.

---

[4] Parsons states she was "nominated" and assumed a part-time Charge Analyst position in December 2009, while she continued to work as a Licensed Practical Nurse in the ED. (Docket No. 40-1, at 5.) She became a full-time Charge Analyst in the Finance Department in January 2012. (Docket No. 22-1, at 10.) She testified that she was not called in to help when Harman was out on leave and that Harman's absence had "nothing to do with [her] position." (Docket No. 40-1, at 6.)
[5] On May 31, 2012, Harman filed a complaint for age discrimination with the EEOC. (Docket No. 17, at ¶ 33.) On December 6, 2012, Plaintiff received a right to sue letter from the EEOC. (*Id*.)

22-1, at 3). Parsons had prior experience as a Licensed Practical Nurse. (*Id.*) Both Daunis and Parsons were employees of the Defendants before assuming the Charge Analyst positions.[6]

DISCUSSION

Harman alleges that the reason given for her termination—namely that her position was being "phased out" as part of the "best practices" plan—was pretext and she was actually terminated because of her medical condition and age. On the other hand, the Defendants contend that Harman's position was eliminated, rather than terminated, and the plans to "eliminate" her position were set in motion prior to her use of FMLA leave, and that age did not play a factor in this elimination.

I. FMLA Claim - Retaliation

The FMLA prohibits employers from interfering with rights protected by the statute or from retaliating/discriminating against an individual for exercising their rights under the statute. 29 U.S.C. § 2615(a)(1)-(2). Harman received the full twelve week entitlement in connection with her FMLA leave of absence for breast cancer treatment and the Defendants did not interfere with her right to this leave. Therefore, her only possible FMLA claim is that the Defendants retaliated against her.

The crux of a retaliation claim is whether the Defendants instituted "the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (citing *Edgar v. Jac Prods.*,

---

[6] The Court notes that this is not a case where Daunis and Parsons assumed Harman's job duties while continuing to perform other/previous jobs. There were two newly created positions of ED Charge Analyst positions which Daunis and Parsons left their old positions to assume.

*Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)). A retaliation claim can be established either through direct evidence of retaliation or circumstantial evidence that would support an inference of retaliation. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). Retaliation claims supported by circumstantial evidence should be examined using the burden-shifting framework for discrimination claims established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Id*. In this case, Harman has no direct evidence of any retaliation and, therefore, the *McDonnell/Burdine* framework applies.

A. *Prima Facie* Case – FMLA Claim of Retaliation

Under the *McDonnell/Burdine* framework, a plaintiff has the initial burden to establish a *prima facie* case of retaliation.[7] In order to establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) she engaged in protected activity; (2) this engagement was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 564 (6th Cir. 2000).

In this case, Harman took a FMLA leave of absence of which the Defendants were aware. Thus, the Defendants concede that Harman has established the first two elements of her *prima facie* case. (Docket No. 22-1, at 7.) Regarding the third element, the Defendants argue there was no "adverse" employment action because her position was "eliminated," rather than terminated.

---

[7] The Sixth Circuit has held that it is appropriate to apply the *McDonnell/Burdine* burden-shifting analysis when an employer seeks to prove that it would have terminated the employee's position regardless of whether she took FMLA leave. *Saulter v. Detroit Area Agency on Aging*, 2014 WL 1328330, at *13, 15 n.1 (6th Cir. Apr. 4, 2014) (unpublished) (noting this conclusion is different from that of the Third, Eighth, Ninth, Tenth, and Eleventh Circuits).

(*Id.*) The Court finds a termination of Harman's position, rather than an elimination, occurred and that, in any event, the reduction of her job duties was an "adverse" employment action.[8]

Two other employees, Daunis and Parsons, assuming the job duties and title of this position contradicts the contention it was eliminated. While it appears there was an increase in the responsibilities incumbent in these new" Charge Analyst positions, consistent with the "best practices" approach, as compared to when Harman was in the position, that does not necessarily lead to the conclusion that an elimination occurred. Notably, Daunis "temporarily" assumed the duties while Harman was out on FMLA leave and then, at some point after her return, permanently took the position. The Defendants state the date Daunis was "transferred" to the Charge Analyst position was January 17, 2010, which was approximately the same time Harman took FMLA leave. Admittedly, it appears that both Parsons and Daunis had clinical backgrounds that Harman did not possess, which would be consistent with the "best practices" approach recommending strong clinical backgrounds—although Daunis clearly did not have "ED RN experience." (*See* Docket No. 23, at 8.) However, in any event, the significant reduction of Harman's job duties upon her return from FMLA leave constitutes an immediate adverse employment action. Therefore, this significant reduction and her eventual termination requires

---

[8] ER Director Beth Winter's deposition testimony stating that the position was "transferred" to another department, while not determinative, supports this conclusion:
> Q: When you say "absorbed," the analyst's position didn't go away did it?
> A: "Absorbed" is probably not the correct term. "Transferred" would be a better term. Transferred to finance.
> Q: So instead of the charge analyst being physically in the ER under your jurisdiction, they were moved to the finance department?
> A: Yes.
> Q: And so her job wasn't eliminated in the hospital overall, was it? It was eliminated in your department?
> A: Yes.
> Q: It was transferred from your department –
> A: It was transferred
> Q: -- to another department, wasn't it? If you could answer –
> A: Yes.

(Docket No. 25-1, at 5.) The fact the position was "transferred" belies the notion that the position was "eliminated."

the conclusion that, despite the Defendants' contentions to the contrary, Harman suffered an "adverse" employment action.

Regarding the fourth element, if the only "act of retaliation" was that Harman's position was terminated a year and a half after her FMLA leave, the Court would be inclined to find a lack of causal connection between the protected activity and the adverse employment action. However, Harman's job duties were *immediately* reduced significantly upon her return from FMLA leave. *See, e.g.*, *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (stating "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection"). Therefore, Harman has established the requisite casual connection. Having established all four elements, Harman has made out a *prima facie* case of FMLA retaliation.

B.  Defendants' Legitimate, Non-Retaliatory Reason – The "Best Practices" Plan

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to present a legitimate, non-retaliatory reason for terminating the plaintiff. *See Seeger*, 681 F.3d at 282. "If the defendant succeeds, the burden shifts back to the plaintiff to show that the employer's proffered reason is a pretext for unlawful discrimination." *Bryson*, 498 F.3d at 570. To establish pretext, a plaintiff is required to show by a preponderance of the evidence that: (1) the proffered reason had no basis in fact, (2) the reason did not actually motivate the plaintiff's discharge, or (3) the reason was insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)). "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Bryson*, 498 F.3d at 570.

The Defendants have proffered documents outlining a "best practices" plan requiring clinical backgrounds for the ED Charge Analyst positions, (Docket No. 32), deposition testimony positing the plan as the justification for Harman's termination, and job postings for these positions dated December 2009, (Docket No. 23, at 2-7). Therefore, the Defendants have presented a legitimate, non-retaliatory reason for terminating Harman, and the burden shifts to her to show that their reason is pretext for unlawful discrimination.

Nothing in the FMLA entitles Harman to an employment status or position beyond that she would have had in the absence of taking leave. 29 U.S.C. § 2614(a)(3)(B); *see also Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir. 1998) ("Under FMLA, an employee who requests leave or is on leave has no great rights than an employee who remains at work."). Accordingly, "an employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA than he or she did before submitting the request." *Gunnell*, 152 F.3d at 1262.

Summary judgment is warranted for the Defendants on the FMLA claim because Harman is unable to show that the articulated legitimate, non-discriminatory reason—the "best practices" plan—is pretext for unlawful discrimination as retaliation for Harman exercising her rights under the FMLA. The Defendants have shown the existence, prior to Harman's FMLA leave, of a "best practices" plan recommending ED Charge Analysts have "strong" clinical backgrounds, job postings for these positions, and an "Action Plan" for implementing this plan. (Docket No. 23.) Michelle Hayden articulated the substantive changes in the methodology used in the ED for performing charge capture, which necessitated the need for clinically experienced individuals:

> A: . . . But, again, that's what — that's what precipitated us into changing our process. At this time, the nurses were filling out the acuity sheets, and

> then Stephanie was entering those charges from there. But we decided that it's best to take that out of the frontline staff. Let them do their clinical work. We go on the back side and look at the documentation as to what's in the chart to do the billing.

(Docket No. 25-4, at 22-23.) The Defendants made the decision to implement a new plan for charge capture prior to Harman's FMLA leave and she did not have the clinical experience or credentials to satisfy the plan's objective. There is nothing in the record that creates a genuine dispute of material fact as to what motivated the Defendants' termination. The fact that Harman experienced an adverse employment action, the reduction of her job duties, immediately upon her return from FMLA leave is immaterial because nothing in the FMLA entitles her to an employment status or position beyond that she would have had in the absence of taking leave. 29 U.S.C. § 2614(a)(3)(B). Accordingly, the Court will **GRANT** the Defendants' Motion for Summary Judgment, (Docket No. 22), and **DENY** Plaintiff Harman's Motion for Summary Judgment, (Docket No. 24), on the FMLA claim.

II. ADEA Claim

As with her FMLA claim, Harman has no direct evidence of age discrimination. Therefore, the same burden-shifting approach of *McDonnell/Burdine* applies. A plaintiff may make a *prima facie* case of age discrimination by showing: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.[9] *See, e.g., O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S.

---

[9] The Court notes that Harman has appeared to contend, (Docket No. 26, at 27), that a modified framework for when a "plaintiff is discharged in connection with a reduction is force" is applicable. *See Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1991); *see also Williams v. Tyco Elec. Corp.*, 161 F. App'x. 526, 534, 536 (6th Cir. January 3, 2006) (unpublished); *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464-65 (6th Cir. 1990). Under this modified framework, "a plaintiff is not required to plead the fourth prong," but rather, "must present additional

308, 312-13 (1996) (stating "the *prima facie* case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion" and recognizing that, in the age-discrimination context, "such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger"); *Grosjean v. First Energy Corp.,* 349 F.3d 332, 336 (6th Cir. 2003); *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1991). Under the fourth prong, an inference can be drawn from the replacement by a "significantly" younger worker. *See O'Connor*, 517 U.S. at 313; *see also Grosjean*, 349 F.3d at 336.

A. *Prima Facie* Case – ADEA Claim

The Defendants concede that, because Harman was over the age of forty during the time frame relevant to this lawsuit, she falls within the class of individuals protected pursuant to the ADEA and, therefore, the first element is established. For the same reasons discussed above regarding the FMLA claim, the Court holds that Harman suffered an "adverse" employment action and, therefore, the second element is established.

Regarding the third element, the Defendants contend Harman was not qualified for the Charge Analyst position due to the "best practices" plan. (Docket No. 22-1, at 9-10.) For the same reasons discussed above, the Court finds that Harman was not qualified for the job. However, even assuming Harman could satisfy this element, the Court would hold that she is

---

direct, circumstantial, or statistical evidence tending to indicate that the employer singled [him or her] for discharge for impermissible reasons." *Godfredson*, 173 F.3d at 371.
      However, the Court finds that the appropriate test is the one which applies when an employee is "replaced." *Id*. at 372-73 (holding employee is "replaced," rather than terminated as part of a reduction in force, when another employee is hired or reassigned to perform the employee's duties or the nature of the replacement's employment is "fundamentally changed"). In this case, Daunis assumed Harman's prior job duties and, at the very least, the nature of her duties "fundamentally changed." In any event, under either standard, the Court would find the Defendants are entitled to summary judgment as Harman cannot make a *prima facie* case.

unable to satisfy the fourth element and, therefore, summary judgment is warranted to the Defendants on the ADEA claim.

For the purposes of the fourth element, the Court will find that Daunis, rather than Parsons, "replaced" Harman. *See Grosjean*, 349 F.3d at 336 ("A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.") Daunis temporarily assumed the job during Harman's leave and then, at some point later, shifted permanently into the job as Harman's job duties were significantly reduced and she was eventually terminated. *See Blizzard v. Marion Technical College*, 698 F.3d 275, 284 (6th Cir. 2012). On the other hand, Parsons states she was "nominated" and assumed a part-time Charge Analyst position in December 2009, while she continued to work as a Licensed Practical Nurse in the ED. (Docket No. 40-1, at 5.) She became a full-time Charge Analyst in the Finance Department in January 2012. (Docket No. 22-1, at 10.) She testified that she was not called in to help when Harman was out on leave and that Harman's absence had "nothing to do with [her] position." (Docket No. 40-1, at 6.)

The fourth element of the *prima facie* case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion. *Grosjean*, 349 F.3d at 336. "This inference cannot be drawn from the replacement of one worker with another worker insignificantly younger." *Id*. (citation omitted). Harman was born on March 4, 1959, and Daunis was born on November 13, 1967, (Docket No. 25-8, at 3), an age difference of approximately 8 years and 8 months.[10]

---

[10] The fact that Harman was replaced by Daunis, who is as much part of the protected class of workers over 40 as Harman, does not preclude the making of a *prima facie* case. *See, e.g.*, *Grosjean*, 349 F.3d at 336.

Absent direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant. *Blizzard*, 698 F.3d at 284. An age difference of ten or more years is generally considered significant. *Id*. An age difference of six to ten years must be considered on a case-by-case basis. *Id*. In this "zone of discretion"—where an age difference of six to ten years exists—the district court must exercise its discretion in determining whether the age difference is sufficient to create an issue of material fact at the summary judgment stage. *Id*. (finding district court's decision determining a six-and-a-half year age was sufficient to create an issue of material fact was a reasonable exercise of the court's discretion).

In this case, Harman presents no evidence, other than an age difference of 8 years and 8 months, of age discrimination. Accordingly, exercising its discretion, the Court finds that this age difference, without more, is not "significant" enough to give an inference of discrimination. *Scola v. Publix Supermarkets, Inc.*, 2014 WL 756708, at *9 (6th Cir. Feb. 27, 2014) (unpublished) (finding district court reasonably concluded that seven-year age difference, without more, was not significant and not enough to give to an inference of discrimination in the eyes of a reasonable fact finder in affirming grant of summary judgment on an ADEA claim).[11]

---

[11] The Court notes that the Defendants' case for summary judgment is even stronger with respect to the ADEA claim than with FMLA claim, although the Court grants the Defendants summary judgment on both claims. As the Defendants have argued, (Docket No. 30, Response to Plaintiff's Motion for Summary Judgment, at 5), if Harman's ADEA claim is based the diminishment of her job responsibilities, that claim is time-barred because her charge of discrimination with the EEOC was filed more than 300 days from the date of that event, approximately April 2010. *See Amini v. Oberlin College*, 259 F.3d 493, 497, 500, 502 (6th Cir. 2001) (affirming district court's dismissal of ADEA claim because charges with the EEOC were not filed within 300 days of the event). Harman filed a complaint for age discrimination with the EEOC on May 31, 2012. (Docket No. 17, at ¶ 33.) Notably, Harman has not responded to the contention that the ADEA claim would be time-barred, at least if it was based on the diminishment of her job responsibilities.

Conversely, with the FMLA claim the statute of limitations requires that a suit must be brought within a two year period of the date of the *last* violation unless the employer acted willfully in violating the statute, in which case the action may be brought within three years of the *last* violation. 29 U.S.C. § 2617(c). Therefore, the Court

Accordingly, the Court will **GRANT** the Defendants' Motion for Summary Judgment, (Docket No. 22), and **DENY** Plaintiff Stephanie Harman's Motion for Summary Judgment, (Docket No. 24), on the ADEA claim. Because the Court determines that Harman has not made a *prima facie* case of ADEA discrimination, it need not determine if Harman can establish that the reason given for her termination was pretext.

Plaintiff Stephanie Harman has also filed a Motion to File a Second Amended Complaint. (Docket No. 21.) Harman seeks to amend her Complaint to include, as part of Count I (Age Discrimination), a violation of her rights under *both* federal and state law. Previously, Count I only alleged a claim under ADEA—a federal law claim. (Docket No. 17, at 6.) Plaintiff seeks to amend Count I to state a violation of the Kentucky Civil Rights Act (KCRA), K.R.S. § 344.040(1)—a state law claim. Because the state law claim and the federal law ADEA claim have essentially the same elements and the Court is granting the Defendants summary judgment on the ADEA claim, the Court will **DENY** Plaintiff's Motion to File a Second Amended Complaint. (Docket No. 21.)

---

may appropriately consider *both* the immediate diminishment of job duties and the eventual termination with respect to the FMLA claim, but arguably not as to the ADEA claim.

CONCLUSION

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment, (Docket No. 22), is **GRANTED**. Plaintiff's Motion to File a Second Amended Complaint, (Docket No. 21), and Motion for Summary Judgment, (Docket No. 24), are **DENIED**.

IT IS SO ORDERED.

Date:

cc: Counsel