UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00159-TBR

STEPHANIE GALE HARMAN                                                                    Plaintiff

v.

WESTERN BAPTIST HOSPITAL and BAPTIST                                          Defendants
HEALTHCARE SYSTEM, INC.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Plaintiff Stephanie Gale Harman's Motion to Alter the Court's Judgment entered on July 15, 2014, at Docket Nos. 57 and 58. (Docket No. 59.) For the following reasons, the Court will **GRANT** Plaintiff's Motion to Alter the Judgment entered on July 15, 2014, at Docket Nos. 57 and 58, (Docket No. 59), and will **DENY** Defendants' Motion for Summary Judgment on the Family Medical Leave Act (FMLA) claim. (Docket No. 22.)

BACKGROUND

Plaintiff Stephanie Gale Harman was employed by the Defendants from June 1993 until January 29, 2012. (Docket No. 17, at 3 ¶ 11.) In 2006, Harman was assigned the position of Emergency Room Department (ED) Charge Analyst, a promotion from her previous position of Health Unit Coordinator. (*Id*. at ¶ 14.) The job duties of the Charge Analyst position included "the review of charges for various medical services in the ED to attempt to capture revenues from charges in the ED." (*Id*. at ¶14.) In essence, a Charge Analyst reviews the documentation from services rendered in the ED to ensure charges are correct and justified. (Docket No. 25-2,

at 16.) After this review, a Charge Analyst provides the prepared information to employees with coding responsibilities to facilitate billing for the services and supplies identified as chargeable. (*Id*. at 18-19.)

The Defendants have produced documents, dated June 16, 2009, discussing a "best practices" or restructuring plan, which essentially recommends changing some of the duties of the ED Charge Analyst and requiring that they have a clinical background. (Docket No. 23, at 8-13.) These documents state, in relevant part:

> **Western Baptist Hospital**
> **ED Charge Capture/Charge Entry Business Case**
> **6/16/09**
>
> There have been challenges related to the charge capture processes in the Emergency department over the last 2 years.
>     . . . .
> The current charge capture process relies on the nursing staff to accurately document clinical procedures and infusion start/stop times. The nursing staff also completes the visit level assignment tool and the charge ticket (to indicate procedures performed).
>     . . . .
> After data analysis and interviews with the ED leadership team it has been determined that the current charge capture process can be improved both from an accuracy and timeliness perspective by enhancing the charge entry staff role (both personnel skill set and responsibilities).
>     . . . .
> At BHE and CHB, which have similar ED volumes and acuity to WBH, the Emergency department employs 2.0 full time staff members for charge entry.  These individuals review the nursing documentation and subsequently complete the visit level assignment tool and charge ticket. They are responsible for determining the infusion and injection charges in a manner, which is consistent with CMS's complex infusion hierarchy rules. The charge entry staff members are also responsible for entering all ED charges and performing charge reconciliation. This model is consistent with industry best practice for accurate and thorough ED charge capture.
>
> WBH would benefit from a similar ED charge capture model. *The ideal staff for these positions would have a strong clinical background in Emergency Medicine (i.e. ED RN experience).*

(Docket No. 23, at 8) (emphasis added).

A "Western Baptist Hospital Action Plan" and accompanying chart, dated December 7, 2009, states "[a] new charge process was approved in the fall of 2009" and designates January 2010[1] as the time period which "licensed" staff would be identified for the new positions and trained. (Docket No. 23, at 10-11.) Regarding new staff identification, it states one was "identified already."[2] (*Id*. at 11.) While not entirely clear, every indication from the Action Plan and the corresponding chart was that the "plan" would be fully implemented in January or February 2010. (*See* Docket No. 23, at 10-13.)

The Defendants have also produced two Job Opening listings, apparently posted on June 16, 2009, for ED Charge Analyst positions. (Docket No. 23, at 2-6.) The qualifications section of these job postings state:

> Current licensure by the Kentucky Board of Nursing as an LPN or by the Kentucky Board of Emergency Medical Services as a paramedic is required. Emergency Department experience is preferred.

(Docket No. 23, at 3, 6.)[3]

In January 2010, Harman notified Defendant Baptist Hospital that she needed to take a medical leave of absence in order to seek treatment for breast cancer. (Docket No. 17, at 3-4 ¶ 17.) After Harman's return to work in April 2010, she was notified that she was to "no longer

---

[1] The Court assumes that the transcription of January 2009, rather than 2010, was a typographical error. (*See* Docket No. 23, at 11.)

[2] It appears that this was in reference to Gwyn Parsons, because the Defendants contend she was "transferred" into the ED Charge Analysis position on a part-time basis on December 6, 2009.

[3] The Court notes that Julie Daunis, Harman's eventual replacement, does not appear to meet the qualifications in these job openings, as she does not have either of the required licenses. (*See generally* Docket No. 40-1, at 7.)

Page 3 of 20

review patient charges but only to input coding information, effectively removing 90% of [her] job duties as Charge Analyst."[4] (Docket No. 17, at 4 ¶ 21.)

Prior to taking FMLA leave, Harman taught another employee, Julie Daunis, the "basics" of the position and Daunis would assume some of the job duties while Harman was out on vacation. (Docket No. 25-2, at 5-6.) When Harman took FMLA leave, Daunis "temporarily" performed the Charge Analysis duties. (Docket No. 17, at 3-4.) After Harman's return from FMLA leave, Daunis continued to work as a Charge Analyst and Harman would sometimes answer questions she had regarding the position. (*Id*.) Subsequently, Daunis assumed the Charge Analyst position on a permanent basis, although she cannot recall exactly when she became permanent. (Docket No. 25-2, at 9-10.) Daunis did not apply for the Charge Analyst position when it was advertised, but was instead recruited by the Defendants to permanently assume it. (*Id*. at 5.) Daunis continued in the position after Harman's eventual termination. (Docket No. 17, at 3-4.)

In December of 2011, Harman was notified by Beth Winters, who had just been made the ER Director in June of 2011, that "her position was being 'phased out' and was given 60 days notice to apply for another position at the hospital with no assurance she would be hired." (*Id*. at ¶ 23.) Harman's job duties were formally transferred to the Finance Department and assumed by Julie Daunis and Gwyn Parsons—both of whom had already been performing these job duties for several months.[5] (Docket No. 25-1, at 57-59.) Parsons had prior experience as a Licensed

---

[4] At that point, upon her return from FMLA leave, Harman states that charge entry consumed only approximately one hour for each day of ED services to patients. Her other duties included assisting with the scheduling of personnel to work in the ED, as well as ordering and stocking supplies needed for patient care in the ED.

[5] Parsons states she was "nominated" and assumed a part-time Charge Analyst position in December 2009, while she continued to work as a Licensed Practical Nurse in the ED. (Docket No. 40-1, at 5.) She became a full-time

Practical Nurse. (Docket No. 22-1, at 3.) Daunis had prior experience as an Emergency Room Technician. (Docket No. 25-2, at 14-15.) Both Daunis and Parsons were employees of the Defendants before assuming the Charge Analyst positions.[6] At no point prior to the notice of discharge in December 2011 or the filing of this lawsuit was Harman informed that her job would be terminated, eliminated, or transferred to another department. Harman alleges that her termination, effective February 2012, was a violation of the FMLA and ADEA.[7]

On July 15, 2014, at Docket Nos. 57 and 58, the Court granted Defendants' summary judgment on both the FMLA and ADEA claims, and dismissed the case. Subsequently, Harman moved the Court to alter or amend its judgment under Rule 59(e) of the Federal Rule of Civil Procedure, (Docket No. 59), arguing that the Court erred by granting summary judgment to the Defendants on the FMLA claim.

STANDARD

Although the Federal Rules of Civil Procedure do not provide expressly for "motions for reconsideration," courts generally construe such motions as motions to alter or amend a

---

Charge Analyst in the Finance Department in January 2012. (Docket No. 22-1, at 10.) She testified that she was not called in to help when Harman was out on leave and that Harman's absence had "nothing to do with [her] position." (Docket No. 40-1, at 6.)

[6] The Court notes that this is not a case where Daunis and Parsons assumed Harman's job duties while continuing to perform other/previous jobs. There were two newly created positions of "ED Charge Analyst," albeit apparently with more responsibilities, which Daunis and Parsons left their old positions to assume.

[7] Plaintiff also previously alleged her reduction in job duties and eventual termination was in violation of the Age Discrimination and Employment Act (ADEA). Plaintiff's Motion to Alter or Amend, (Docket No. 59), focuses only on the FMLA claim and does not request the Court reconsider the ADEA claim. Therefore, the Court focuses only on the FMLA claim in this opinion.

judgment under Rule 59(e).[8]  *E.g.*, *Moody v. Pepsi-Cola Metro. Bottling Co.*, 915 F. 2d 201, 206 (6th Cir. 1990); *Taylor v. Colo. State Univ.*, 2013 WL 1563233, at *8-9 (W.D. Ky. Apr. 12, 2013).

The Sixth Circuit has consistently held that a Rule 59 motion should not be used either to reargue a case on the merits or to reargue issues already presented, *see Whitehead v. Bowen*, 301 F. App'x 484, 489 (6th Cir. 2008) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998)), or otherwise to "merely restyle or rehash the initial issues," *White v. Hitachi, Ltd.*, 2008 WL 782565, at *1 (E.D. Tenn. Mar. 20, 2008) (internal quotation marks and citation omitted). "It is not the function of a motion to reconsider arguments already considered and rejected by the court." *Id.* (citation omitted).

As another district court in this Circuit put it, "[w]here a party views the law in a light contrary to that of this Court, its proper recourse is not by way of a motion for reconsideration but appeal to the Sixth Circuit." *Hitachi Med. Sys. Am., Inc. v. Branch*, 2010 WL 2836788, at *1 (N.D. Ohio July 20, 2010) (internal quotation marks and citations omitted). Accordingly, the Sixth Circuit instructs that a motion for reconsideration should only be granted on four grounds: "Under Rule 59, a court may alter or amend a judgment based on: '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). Furthermore, because there is an interest in the finality of a decision, this Court and other district courts have held that "[s]uch motions are extraordinary and sparingly granted." *Marshall v. Johnson*, 2007

---

[8] The Court notes that FRCP 59(e) requires that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment." The Order dismissing Plaintiff's case was entered on July 15, 2014 at Docket No. 58. Plaintiff's motion to alter or amend was filed on August 12, 2014. (Docket No. 59.)

WL 1175046, at *2 (W.D. Ky. Apr. 19, 2007) (citing *Plaskon Elec. Materials, Inc. v. Allied-Signal, Inc.*, 904 F. Supp. 644, 669 (N.D. Ohio 1995)); *accord Rottmund v. Cont'l Assurance Co.*, 813 F. Supp. 1104, 1107 (E.D. Pa. 1992).

## DISCUSSION

I. This Court Will Alter its Previous Judgment Under Rule 59(e) Because It Did Not Give Due Weight to the Totality of the Circumstances

Upon review of all of the evidence in the record and the Court's previous holdings on the FMLA claim, the Court finds that it did not give enough consideration to the totality of the circumstances presented in this case. In retrospect, the Court believes it did not appropriately account for the totality of circumstances, which placed in doubt Defendants' purported basis for terminating Harman, namely the best practices plan. To that end, the Court finds instructive the Sixth Circuit cases of *Arban v. West Pub. Corp.*, 345 F.3d 390 (6th Cir. 2003), and *Moorer v. Baptist Memorial Health Care System*, 398 F.3d 469 (6th Cir. 2005). These cases demonstrate that at a certain threshold, circumstantial evidence and the totality of circumstances can create a genuine dispute of material fact as to an employer's motivation for an adverse employment action when the employer has put forth a legitimate, non-retaliatory reason for that employment action. Therefore, for the reasons discussed below, the Court will **GRANT** Plaintiff's Motion to Alter its Judgment at Docket Nos. 57 and 58 and deny Defendants' summary judgment on the FMLA claim, because it finds it made "a clear error of law" and such action is needed "to prevent manifest injustice." *Leisure Caviar, LLC*, 616 F.3d at 615. The resolution of Harman's FMLA claim is best left for a jury.

**I.     FMLA Claim – Retaliation**

Harman alleges that the reason given for her termination—namely that her position was being "phased out" as part of the "best practices" plan—was pretext and she was actually terminated because of her medical condition. On the other hand, the Defendants contend that Harman's position was eliminated, rather than terminated, and the plans to "eliminate" her position were set in motion prior to her use of FMLA leave.

The FMLA prohibits employers from interfering with rights protected by the statute or from retaliating or discriminating against an individual for exercising their rights under the statute. 29 U.S.C. § 2615(a)(1)-(2). Harman received the full twelve week entitlement in connection with her FMLA leave of absence for breast cancer treatment and the Defendants did not interfere with her right to this leave. Therefore, her only FMLA claim is that the Defendants retaliated against her.

The crux of a retaliation claim is whether the Defendants instituted "the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (citing *Edgar v. Jac Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)). A retaliation claim can be established either through direct evidence of retaliation or circumstantial evidence that would support an inference of retaliation. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). Retaliation claims supported by circumstantial evidence should be examined using the burden-shifting framework for discrimination claims established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

*Id*. In this case, Harman has no direct evidence of any retaliation and, therefore, the *McDonnell/Burdine* framework applies.

### A. *Prima Facie* Case – FMLA Claim of Retaliation

Under the *McDonnell/Burdine* framework, a plaintiff has the initial burden to establish a *prima facie* case of retaliation.[9] In order to establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) she engaged in protected activity; (2) this engagement was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 564 (6th Cir. 2000).

In this case, Harman took a FMLA leave of absence of which the Defendants were aware. Thus, the Defendants concede that Harman has established the first two elements of her *prima facie* case. (Docket No. 22-1, at 7.) Regarding the third element, the Defendants argue there was no "adverse" employment action because her position was "eliminated," rather than terminated. (*Id*.) The Court finds that a termination of Harman's position, rather than an elimination,[10] occurred. In any event, the reduction of her job duties was an "adverse" employment action.[11]

---

[9] The Sixth Circuit has held that it is appropriate to apply the *McDonnell/Burdine* burden-shifting analysis when an employer seeks to prove that it would have terminated the employee's position regardless of whether she took FMLA leave. *Saulter v. Detroit Area Agency on Aging*, 2014 WL 1328330, at *13, 15 n.1 (6th Cir. Apr. 4, 2014) (unpublished) (noting this conclusion is different from that of the Third, Eighth, Ninth, Tenth, and Eleventh Circuits).

[10] This Court is aware of Defendants' repeated contention that Harman's position was "eliminated," rather than "terminated," because Daunis and Parsons assumed positions that had significantly more responsibilities than those of Harman's Charge Analyst position. While the Court understands these positions may have carried some additional responsibilities beyond those that Harman had, for the reasons stated, it believes that there are genuine issues of material fact as to whether the "best practices" plan was actually implemented, whether Harman was qualified for the position, and what motivated the termination.

[11] ER Director Beth Winter's deposition testimony stating that the position was "transferred" to another department, while not determinative, supports this conclusion:
    Q: When you say "absorbed," the analyst's position didn't go away did it?

That two other employees, Daunis and Parsons, assumed the job duties and title of this position contradicts the contention that it was eliminated. Notably, Daunis "temporarily" assumed the duties while Harman was out on FMLA leave and then, at some point after her return, permanently took the position. The Defendants state the date Daunis was "transferred" to the Charge Analyst position was January 17, 2010, which was approximately the same time Harman took FMLA leave. It appears that both Parsons and Daunis had clinical backgrounds that Harman did not possess, which would arguably be consistent with the "best practices" approach recommending strong clinical backgrounds—although Daunis clearly did not have "ED RN experience." (*See* Docket No. 23, at 8.) However, the significant reduction of Harman's job duties upon her return from FMLA leave constitutes an immediate adverse employment action. Therefore, this significant reduction and her eventual termination requires the conclusion that, despite the Defendants' contentions to the contrary, Harman suffered an "adverse" employment action.

Regarding the fourth element, if the only "act of retaliation" was that Harman's position was terminated 22 months after her FMLA leave, the Court would be inclined to find a lack of causal connection between the protected activity and the adverse employment action. However, Harman's job duties were *immediately* reduced significantly upon her return from FMLA leave.

---

        A: "Absorbed" is probably not the correct term. "Transferred" would be a better term. Transferred to finance.
        Q: So instead of the charge analyst being physically in the ER under your jurisdiction, they were moved to the finance department?
        A: Yes.
        Q: And so her job wasn't eliminated in the hospital overall, was it? It was eliminated in your department?
        A: Yes.
        Q: It was transferred from your department –
        A: It was transferred
        Q: -- to another department, wasn't it? If you could answer –
        A: Yes.
(Docket No. 25-1, at 5.) The fact the position was "transferred" belies the notion that the position was "eliminated."

*See, e.g.*, *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (stating "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection"). Therefore, Harman has established the requisite casual connection. Having established all four elements, Harman has made out a *prima facie* case of FMLA retaliation.

### B. Defendants' Legitimate, Non-Retaliatory Reason – The "Best Practices" Plan

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to present a legitimate, non-retaliatory reason for terminating the plaintiff. *See Seeger*, 681 F.3d at 282. "If the defendant succeeds, the burden shifts back to the plaintiff to show that the employer's proffered reason is a pretext for unlawful discrimination." *Bryson*, 498 F.3d at 570. To establish pretext, a plaintiff is required to show by a preponderance of the evidence that: (1) the proffered reason had no basis in fact, (2) the reason did not actually motivate the plaintiff's discharge, or (3) the reason was insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)). "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Bryson*, 498 F.3d at 570.

The Defendants have proffered documents outlining a "best practices" plan requiring clinical backgrounds for the ED Charge Analyst positions, (Docket No. 32), deposition testimony positing the plan as the justification for Harman's termination, and job postings for these positions dated December 2009, (Docket No. 23, at 2-7). Therefore, the Defendants have presented a legitimate, non-retaliatory reason for terminating Harman, and the burden shifts to her to show that their reason is pretext for unlawful discrimination.

For the following reasons, the Court finds that there are genuine issues of material fact as to what motivated the Defendants' termination, such that summary judgment for either party is improper. *See, e.g.*, *Bryson*, 498 F.3d at 572 ("We conclude that there are genuine issues of material fact as to what information Regis relied upon in deciding to terminate Bryson, such that summary judgment is improper."). The Court finds *Arban v. West Pub. Corp.*, 345 F.3d 390 (6th Cir. 2003), and *Moorer v. Baptist Memorial Health Care System*, 398 F.3d 469 (6th Cir. 2005), while having many factual differences, are instructive. These cases demonstrate that at a certain threshold, circumstantial evidence and the totality of circumstances can create a genuine dispute of material fact as to an employer's motivation for an adverse employment action when the employer has put forth a legitimate, non-retaliatory reason.

In *Arban*, a sales representative, Daniel Arban, had been working with West Publishing Corporation (West) since 1995. *Arban*, 345 F.3d at 394-95. In February 1998, Arban received a "warning letter" from a supervisor admonishing him for misrepresenting an account as "a new sales activity" and warning him that any future occurrence would result in further disciplinary action, which could include termination. *Id*. at 395. On December 16, 1998, Arban met with supervisors to "discuss additional violations of company policy committed by Arban and customer complaints that allegedly had occurred in the intervening months." *Id*.

Email conversations immediately after this meeting between Arban's supervisors arguably showed an agreement to terminate Arban. *Id*. at 395-96, 402. However, the Sixth Circuit noted they were inconclusive and "the jury was entitled to conclude that West was continuing to study the matter and had not come to a final decision by January 6." *Id*.

Nevertheless, West argued a decision was made to terminate Arban "after the holidays," although this decision was not communicated to him. *Arban*, 345 F.3d at 403.

Subsequently, on December 21, a supervisor accompanied Arban on a "field ride." *Id*. At trial, Arban testified that during this field ride the supervisor indicated he was "very satisfied" and "did not indicate that any action would be taken against Arban." *Id*. On December 23, Arban awoke to a medical condition that required him to request FMLA leave, which began on December 25. *Id*. On December 29, during his medical leave, an employee contacted Arban, at a supervisor's instruction, stating the supervisor had "instructed him to get these hot lists, to get the different accounts and pending sales he could work with." *Id*. at 397. Subsequently, that supervisor, Robert Wolfe, followed up regarding this issue. *Id*. After several phone calls, a conversation over the telephone ensued with Wolfe again requesting that Arban hand over the "leads" and Arban stating that he did not feel comfortable doing any work because he could jeopardize his benefits. *Id*. This caused several disagreements and subsequently, on January 6, Wolfe requested that Arban submit his resignation, which he did on January 8. *Arban*, 345 F.3d at 399-400.

The Sixth Circuit found there was sufficient evidence to support the jury's conclusion that the employer retaliated against the employee for taking leave under the FMLA and that the employer's explanation for the termination was disingenuous, *Arban*, 345 F.3d at 403, despite "considerable evidence that the decision to terminate [the employee] had been made before [he] went on medical leave, but that his actual termination had been deferred until after the holidays." *Moorer*, 398 F.3d at 469 (discussing *Arban*).

Similar to Harman, plans had arguably been made to terminate Arban based on a legitimate, non-discriminatory reason *prior* to his taking leave, although these plans were never made known to Arban. However, at trial, "Arban cast doubt upon both the timing of and the reasons for the decision to terminate him." *Arban*, 345 F.3d at 401. Like Arban, Harman has cast doubt upon the timing of the termination decision, which was immediately after her return from FMLA leave, to significantly reduce her job duties. Harman has also cast doubt upon the reasons given for her termination decision, the "best practices plan," because the reduction in her job duties was inconsistent with the timeframe contemplated by that plan, her replacement—Daunis—does not appear to meet the qualifications delineated in both the plan and the job postings, it appears Harman was the only employee to lose her job as a result of the "best practices" plan, and that in 20 other revenue-producing departments in the hospital there is not necessarily a policy that everyone who performs Charge Analyst job duties must have a clinical background.

In *Moorer*, William Moorer worked in several positions for Baptist Memorial Health Care System and Health Care Corporation (Baptist) for seventeen years, culminating in his promotion to Administrator and Chief Financial Officer of two hospitals. *Moorer*, 398 F.3d at 472-73. On July 22, 1997, Moorer's direct supervisor, Cathy Hill, "thought she perceived the smell of alcohol on his breath" at a job-related meeting and noticed that during the meeting Hill acted in a manner consistent with intoxication. *Id*. at 473-75. Prior to this meeting, Moorer had some performance issues which had been documented and discussed with him. *Id*. at 473.

Hill did not confront Moorer about her concern of intoxication, but instead spoke with her supervisor and the Senior Vice President of Human Resources. *Id*. at 474. Eventually, the

decision was made to request Moorer seek treatment in alcohol rehabilitation and further discuss and outline his performance issues, which had apparently not been completely remedied. *Id*. at 474-75. A meeting took place on August 19, 1997, where Moorer was assured he would have a job when he returned from alcohol rehabilitation. *Id*. at 475. Moorer's treatment in alcohol rehabilitation began on August 22, 1997, and was scheduled for five weeks. *Id*. During this same timeframe, additional complaints and issues with Moorer's job performance were brought to Hill's attention. *Moorer*, 398 F.3d at 476. As a result, Hill recommended that Moorer be terminated. *Id*. at 476-77. Subsequently, on September 18, 1997, Hill and her supervisor traveled to the alcohol rehabilitation facility to convey the termination decision to Moorer in person. *Id*.

The Sixth Circuit reversed the district court's grant of summary judgment to the employer on the FMLA claim, finding there was a "genuine dispute of material fact as to whether Moorer's dismissal would have occurred regardless of his taking of FMLA leave."[12] *Id*. at 486, 489. Analogizing to *Arban*, the Sixth Circuit found "significant evidence in the record for casting doubt upon the reasons for Baptist's decision to terminate Moorer." *Id*. at 489. This evidence included: (1) the conclusion that it defies basic logic that a leave period of at least 3-4 weeks in rehabilitation was necessary based upon observation of a single incident; (2) that Hill misrepresented some of the reasons that her recommendation was based upon; (3) "evidence that the performance-related reasons for Moorer's discharge were undermined by an affidavit of Dr. Cannon, who stated that his complaints concerning management were not directed at Moorer;"

---

[12] The Court notes that *Moorer* was a 2-1 decision, with the dissent disagreeing with the reversal of the grant of summary judgment on the FMLA claim. *Moorer*, 398 F.3d at 490-91. The dissent argued there was "not a shred of evidence that [Moorer's] firing had anything to do with his taking of FMLA leave. The FMLA leave was directed by his employer, and Moorer had no objection to the taking of the leave in itself." *Id*. at 491. While the Court finds the argument of the dissent persuasive, it is nevertheless bound by Sixth Circuit precedent.

(4) "evidence that the hospitals had 'superb profits' during Moorer's tenure as administrator, as opposed to previous years;" and (5) that Baptist was aware of many of the alleged performance deficiencies prior to Moorer's FMLA leave, but did not intend to immediately fire him until it anticipated he might take leave to treat his alcoholism. *Id*. at 489-90.

Similar to *Moorer*, there is significant evidence in the record casting doubt upon the Defendants' alleged "best practices" justification for reducing Harman's job duties in favor of people with clinical experience, and eventually terminating Harman. First, Daunis and Parsons did not even apply for the open position posted in 2009, and Daunis was originally brought in on only a temporary basis for Harman while she was on leave. Notably, Daunis did not even meet the qualifications of the job posting, as she does not appear to have the required licenses, and is presumably not "licensed staff" as specified in the Action Plan. (Docket No. 23, at 10-11). Although Daunis apparently has a clinical background, she testified that she did not think particular medical training, like a nurse, was needed to perform the job. (Docket No. 25-2, at 6-8.) She also testified that she assumed that her work as a Charge Analyst would only be temporary while Harman was on leave, but that at some time after Harman returned she was told it would be permanent. (*Id*. at 9-12.)

Assuming the plan was implemented in accordance with the documentation produced by the Defendants, one would expect the "new" Charge Analysts to have been *permanently* hired in January 2010. While Daunis cannot recall when she switched from temporary to permanent, it is clear that during the time Harman was out—January to April 2010—Daunis operated under the assumption that her performance of Harman's job was temporary. This is not consistent with the Defendants' contention that the plan's implementation was the reason for the reduction in

Harman's job duties and her termination, because the plan outlined January 2010 as the estimated date for training/hiring of the new staff. *See generally Saulter v. Detroit Area Agency on Aging*, 2014 WL 1328330, at *17 (6th Cir. Apr. 4, 2014) ("[D]rawing all inferences in [the employee's favor], the facts could also demonstrate that her responsibilities were distributed after she took FMLA leave in an effort to cover necessary functions during her absence," rather than as a result of an ongoing, restructuring effort that would have been undertaken whether she had taken leave or not. "On this view of the facts, [the employee] had a right to return to her former position or a comparable position."); 29 C.F.R. § 825.214 ("On return from FMLA leave, . . . an employee is entitled to . . . reinstatement even if the employee had been replaced or his or her position has been restricted to accommodate the employee's absence."). The fact that Daunis assumed her performance of the job was on a temporary basis during Harman's FMLA leave belies the notion that the "best practices" plan was the basis for the reduction in Harman's job duties.

Second, like the employer in *Moorer*, who was aware of the alleged performance deficiencies prior to Moorer's FMLA leave, the Defendants were aware of the "best practices plan" over six months prior to Harman's FMLA leave, yet only reduced her job duties after she returned from FMLA leave. In *Arban* and *Moorer*, the Sixth Circuit stated "the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware)." *Arban*, 345 F.3d at 402 (citation omitted); *Moorer*, 389 F.3d at 489 (citation omitted). Moreover, if this "best practices" plan had, as the Defendants contend, been in the early stages of implementation as early as June 16, 2009,

it is surprising that Harman was not made aware of its implementation until December 2011 and/or upon the filing of this lawsuit. Notably, although everyone was in agreement that Harman was never informed of the "best practices" plan, no one could explain why Harman was not informed about this plan prior to her termination and/or filing of this lawsuit. If an employer implements a plan that requires a new set of qualifications for a job, it only seems natural to inform current employees in that job of these new qualifications if its implementation would result in their termination. This would allow the employee to prepare for his or her termination and, if possible, to obtain the necessary qualifications in order to continue at the job.

Third, it does not appear there was any dissatisfaction with Harman's job performance. In any event, Michelle Hayden and Beth Winters admit to not having reviewed her job performance evaluations in making the decision to terminate her.[13] (Docket No. 25-4, at 20; 25-1, at 29.) Finally, it appears that in approximately 20 other revenue-producing departments in the hospital there is not necessarily a policy that everyone who performs Charge Analyst job duties must have a clinical background. Notably, the Defendants were not able to delineate any other employee who lost their jobs as a result of such a requirement. (Docket No. 25-4, at 15-19.) Thus, it appears Harman was the only casualty of this "best practices" plan, and that this plan only impacted the Emergency Room Department.

While none of the circumstances above are determinative alone, considering them in the totality, the Court finds that there are genuine issues of material fact as to what motivated the Defendants' termination, such that summary judgment for either party is improper. Harman's job duties were significantly reduced *immediately* upon her return from FMLA leave and,

---

[13] Hayden and Winters state that job performance was not the reason for Harman's termination.

subsequently, she was terminated in favor of another person, Daunis. The Defendants state this decision was made on the basis of a "best practices" plan, but that plan was allegedly in effect as early as June 16, 2009, and Harman was never made aware of the plan's existence, nor were her job duties ever impacted prior to her taking FMLA leave. Harman's prior job performance was not unsatisfactory; in fact, it appears to have exceeded expectations. Although Daunis was recruited by the Defendants for this position and never actually applied for it, she did not meet the qualifications of the Defendants' own job postings and Action Plan. Prior to assuming the position on a permanent basis, Daunis was under the impression she would only temporarily be an ED Charge Analyst, despite the plan's existence at that time. All of these circumstances belie the notion that there is no genuine dispute of material fact that the "best practices" plan was the reason for the reduction in Harman's job duties and resulting termination. Therefore, the Court will **GRANT** Plaintiff's Motion to Alter or Amend its Previous Judgment, (Docket No. 59), and **DENY** the Defendants summary judgment on the FMLA claim. (Docket Nos. 22, 24.)

In summary, because of the totality of circumstances outlined above, the Court finds there are genuine disputes of material fact that preclude summary judgment on the FMLA claim. However, in reconsidering its prior position and denying summary judgment on the FMLA claim, the Court passes no judgment on the ultimate outcome of this action—that will be a jury question. While Harman may have enough facts and circumstances in her favor to avoid summary judgment, the Defendants' justification for the reduction of her job duties and eventual termination under the "best practices" approach is not without merit.

## CONCLUSION

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED that Plaintiff's Motion to Alter the Judgment entered on July 15, 2014, at Docket Nos. 57 and 58, (Docket No. 59), is **GRANTED**.  The Court **DENIES** the Defendants' Motion for Summary Judgment on the FMLA claim.  (Docket No. 22.)

IT IS SO ORDERED.

Date:

cc:     Counsel